UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRADLEY C. FRAME,                    :
          Plaintiff                  :      No. 1:11-CV-02275
                                     :
     v.                              :      (Judge Caldwell)
                                     :
CAROLYN W. COLVIN, ACTING            :
COMMISSIONER OF SOCIAL               :
SECURITY,                            :
          Defendant                  :

## MEMORANDUM

## BACKGROUND

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Bradley C. Frame's application for social security disability insurance benefits.

Frame protectively filed[1] an application for disability insurance benefits on October 15, 2007. Tr. 11, 20, 100, 314 and 117-121.[2] As will be explained in more detail below Frame alleged that he suffered from totally disabling mental impairments. Tr. 138. On February 13, 2008, the Bureau of Disability Determination[3] denied Frame's application. Tr. 102-106

_____

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on February 9, 2012. Doc. 8.

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 103.

and 314.  On March 28, 2008, Frame requested a hearing before an administrative law judge. Tr. 11, 109-110 and 314.  After a delay of approximately 14 months, a hearing was held before an administrative law judge on May 28, 2009. Tr. 40-99.  On June 24, 2009, the administrative law judge issued a decision denying Frame's application for benefits.  Tr. 11-20.  On June 29, 2009, Frame filed an appeal of the administrative law judge's decision to the Appeals Council of the Social Security Administration. Tr. 5-7.  On November 17, 2009, the Appeals Council concluded that there was no basis upon which to grant Frame's request for review.  Tr. 1-4.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Frame then filed on January 16, 2010, a complaint in this court requesting that we reverse the decision of the Commissioner denying him disability insurance benefits. Frame v. Astrue, Civil No. 10-00105(M.D. Pa)(Muir, J.).  On September 30, 2010, that case was remanded by Judge Muir to the Commissioner for further proceedings.  Judge Muir's opinion in relevant part explained the basis for the remand as follows:

> Matthew Berger, M.D., Frame's treating psychiatrist, completed a functional assessment on February 14, 2008, which would preclude Frame from engaging in any gainful employment. Dr Berger in the assessment found that Frame had marked and extreme limitations in several areas of functioning.  Dr. Berger also completed a document entitled "Medical Source Statement" on March 24, 2009.  In that document Dr. Berger stated that Frame on average would be absent from work because of his psychiatric impairment "about three times a month." Also, in that document Dr. Berger assessed Frame with marked limitations in several areas of functioning, including the ability to complete a normal workday and workweek without interruptions from psychologically

based symptoms.  Dr. Berger further stated with respect
Frame's consumption of alcoholic beverages as follows:
"It is my professional opinion, that the patient,
Bradley Frame, would be disabled due to his psychiatric
condition independently of his substance abuse due to
the fact that the patient's symptoms are present in the
absence of use for an extended period of time."  The
vocational expert who testified at the administrative
hearing stated that if Dr. Berger's opinion regarding
Frame's functional limitations were accepted Frame
could not engage in any substantial gainful activity.
The administrative law judge rejected Dr. Berger's
opinion.

The administrative law judge in rejecting the opinion
of Dr. Berger stated as follows:

> It is standard and very common practice for a
> treating physician to support and accommodate
> claimants' applications for social security with
> the completion and execution of these [Medical
> Source Statement] forms. As such, the physician
> has both an altruistic and financial interest in
> aiding their patients.  The undersigned
> Administrative Law Judge rejects this opinion as
> being without support . . . These forms do not
> require the doctor to justify their opinions
> through objective medical findings, diagnostic
> test results or other competent evidence.  Also,
> with respect to the extent of the limitations in
> cognition and work-processes ascribed by Dr.
> Berger, the undersigned could not uncover any
> evaluation, testing,
> clinical observation or findings by other treating
> sources that would comport with such significant
> limitations.  Thus, Dr. Berger's opinion in this
> regard stands alone and without contextual support
> in the record.  These findings, insofar was (sic)
> inferring extreme deficits in appreciating
> instructions, understanding and carrying out
> instructions, making judgments and even
> significant difficulties in handling simple
> instructions is incongruous with the claimant's
> provision of primary care on a daily basis for a 2
> year
> old child.  Also, Dr. Berger's opinion is grossly
> mismatched with Dr. Church's findings based on the
> MMPI-2 testing. . . . It is clear, based on the
> evidence of record that Dr. Berger's opinions are
> not supported by objective medical findings and
> actual diagnostic results and are hereby rejected.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*\*

There was no contemporaneous opinion by a medical
expert which conflicted with the opinion of Dr. Berger.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*\*

The assertion by the administrative law judge that Dr.
Berger had an "altruistic and financial interest" in
aiding Frame is pure speculation and is not supported
by any evidence in the record.  There is no evidence in
the record that Dr. Berger based his opinion regarding
Frame's functional abilities on anything other than his
best professional judgment.  It was inappropriate for
the administrative law judge to engage in this type of
rationalization. If allowed to stand, an administrative
law judge could reject treating physicians' opinions in
every case . . . .

Finally, our thorough review of the administrative
record which consists of 310 pages reveals that the
administrative law judge failed to address the
testimony of Bonnie Masters, Frame's mother. . .

Frame v. Astrue, Civil No. 10-00105, slip op. at 11-12 & 18-19

(M.D.Pa. September 30, 2010)(Muir, J.)(citations to

administrative record and footnote omitted). Tr. 695-696 and 702-

703.

A second hearing before the same administrative law

judge was held on July 18, 2011, at which only Dr. Berger

testified. Tr. 385-423.  On September 20, 2011, the

administrative law judge issued a decision denying Frame's

application.[4] Tr. 314-327.  Where a case is on remand from a

Federal District Court, the decision of the administrative law

judge becomes the final decision of the Commissioner 61 days

after it is rendered and notice given to the claimant of the

---

4.  The administrative law judge in the second decision did not
repeat the errors which caused Judge Muir to remand the case for
further proceedings.

administrative law judge's decision, if no exceptions are filed with the Appeals Council and the Appeals Council does not review the decision on its own. Tr. 312. No exceptions were filed and the Appeals Council did not review the decision of the ALJ on its own.

Frame then filed a timely complaint in this court on December 7, 2011. Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on June 28, 2012, when Frame filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." There are inconsistent statements in the record regarding when Frame's insured status expired.[6] However, the inconsistencies do not impact our disposition of the case.

Frame was born in the United States on October 24, 1975, and at all times relevant to this matter was considered a "younger

---

5. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

6. The administrative law judge in his first decision stated that Frame was fully insured through December 31, 2012. Tr. 11. However, in his second decision he states that Frame was last insured on December 31, 2011. Tr. 317. Frame does not contend that the earlier date is erroneous.

individual"[7] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §404.1563(c). Tr. 100, 117 and 472. Frame can read, write, speak and understand the English language and perform basic mathematical functions such as counting change, paying bills, handling a savings account and using a checkbook and money orders. Tr. 100, 117, 137, 472 and 504. Frame completed the 10th grade,[8] obtained a General Equivalency Diploma in 1994, and attended one year of college. Tr. 143, 215 and 519. During his elementary and secondary schooling, Frame attended regular education classes. Tr. 143. Frame has prior work experience as a plumber's helper, as a telemarketer, and as a laborer for various enterprises. Tr. 139 and 153. The telemarketer position only lasted 2 months and did not amount to substantial gainful activity. Tr. 87 and 139. All of Frame's prior relevant work was considered at least unskilled to semiskilled, heavy work activity.[9] Tr. 87-88 and 153-156. Social

_____

7. At the time of the second administrative hearing and the ALJ's decision, Frame was 35 years of age. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

8. When examined by Michael A. Church, Ph.D., a licensed psychologist, on April 3, 2007, Frame informed Dr. Church that "he left school during the twelfth grade[.]" Tr. 185. The majority of the records, however, report that he completed the 10th grade and then obtained his GED.

9. The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as
> (continued...)

Security records reveal that Frame had earnings in 1990, 1991, and 1993 through 2007. Tr. 478. During those 17 years, Frame's average yearly income was $5776.06. Id. The most Frame earned was

---

9.  (...continued)
    one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

    (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

    (c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

    (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

    (e) *Very heavy work*. Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

$13243.84 in 2005. Id. Frame's total earnings during those 17 years were $98,193.06 Id.

The administrative record includes a document which reveals that in the years 2007 and 2008 Frame received unemployment compensation benefits. Tr. 131-132. Specifically, during the 4th quarter of 2007 Frame received $2218.00 and during the 1st quarter of 2008 he received $2410.00 in unemployment compensation benefits. Id. Moreover, mental health counseling records refer to Frame receiving unemployment compensation benefits as well as extensions of such benefits and applying for and receiving such benefits as late as April, 2009, while at the same time alleging he was disabled.[10] Tr. 292-294, 301 and 303.

Frame claims that he became disabled on the date he stopped working because of mental problems and alcoholism. Tr. 138. Frame also contends that he has problems "concentrating and remembering instructions." Id. Frame does not contend that he is disabled because of a physical impairment. In documents filed with the Social Security Administration, Frame claims he has not worked since August 1, 2007.[11]

_____

10. An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). The fact that Frame collected unemployment compensation after his alleged disability onset date suggests that he represented when applying for such benefits that he was able and willing to accept employment.

11. Medical records from a treating physician repeatedly indicate that Frame last worked in October of 2007. Tr. See. e.g., 217, 254, 256, 258, 262, 266, 269, 272, 275, 277 and 279.

The testimony of Frame at the first administrative hearing reveals that he is divorced and lives with his mother and his disabled, wheelchair bound stepfather. Tr. 48-52 and 75. Frame at the time of the hearing also had full custody of a 9 year old daughter and partial custody of a 2 year old son. The daughter attends school and during the school year Frame get her up in the morning and ready for school. Tr. 52. Frame has custody of the son from 8:00 a.m. to 4:00 p.m. during weekdays and every other weekend. Tr. 56. His mother is not at home during the day because she works full-time. Tr. 51. Frame stated that he takes care of his son, including changing his diapers, and testified that he did not have any problems providing that care. Tr. 52-53. When asked if his stepfather helped him take care of his son, Frame answered "no." Tr. 54. Frame noted that his stepfather had "disabling tremors." Id.

In a "Function Report - Adult" dated April 6, 2010, Frame indicated that he had no problems with personal care such as dressing, bathing, and feeding himself. Tr. 502. Frame stated that he prepares his own meals and also meals for his son. Tr. 503. Frame spends time on the computer every day. Tr. 505. In the report Frame described a typical day as follows:

> Get out of bed, go to the bathroom, wait for my son,
> Liam, to come to the house about 8:00 a.m., then Liam
> plays and watches cartoons, then while he is doing that
> I will check my email. We might take a walk around the
> park, depending on my mood. About 12:00-1:00, Liam
> takes a nap after lunch and sometimes I do to. At
> 5:00 p.m., his mother comes for him. My daughter,
> Sabrina is in school all day she gets picked-up by
> her grandfather and he takes her to school and he
> picks her up, and brings her back home.

Tr. 501.  In the "Function Report," Frame when asked to check items
which his "illnesses, injuries, or conditions affect" did <u>not</u> check
lifting, squatting, bending, standing, reaching, walking, sitting,
kneeling, stair climbing, seeing, and using hands. Tr. 506.

For the reasons set forth below we will affirm the
decision of the Commissioner.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary
review of all legal issues decided by the Commissioner.  <u>See</u> <u>Poulos</u>
<u>v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007);
<u>Schaudeck v. Commissioner of Social Sec. Admin.</u>,  181 F.3d 429, 431
(3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir.
1995).  However, our review of the Commissioner's findings of fact
pursuant to 42 U.S.C. § 405(g) is to determine whether those
findings are supported by "substantial evidence."  <u>Id.</u>; <u>Brown v.</u>
<u>Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994
F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42 U.S.C. §405(g);
<u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the
ALJ's findings of fact are supported by substantial evidence, we are
bound by those findings, even if we would have decided the factual
inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir.
1981)("Findings of fact by the Secretary must be accepted as
conclusive by a reviewing court if supported by substantial
evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995);

Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve

a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The

Commissioner must indicate which evidence was accepted, which

evidence was rejected, and the reasons for rejecting certain

evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707.

Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968,

970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d

Cir. 1979).


## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual

lives or in several regions of the country.
42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3) has an impairment or combination of

---

12.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

13.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and
(continued...)

13

impairments that meets or equals the requirements of a listed impairment,[14] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as

_____

13.  (...continued)
respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

14.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the medical records.

On March 30, 2007, several months before the alleged disability onset date, Frame was evaluated by Dr. Berger. Tr. 214-217. The purpose of the evaluation was "to be cleared to enlist in the Army." Tr. 214. At the time of this evaluation Frame was not working and told Dr. Berger that he took work off "due to applying to the military." Tr. 215. He further told Dr. Berger that he did not have any prior psychiatric treatment and had never been on psychotropic medications. Tr. 214. Frame denied any suicidal attempts and reported, inter alia, that he had a normal childhood, no current medical problems, no sadness or depression, and no difficulty with memory or concentration. Id. Frame stated that his hobbies were football, baseball, hockey, playstation and war movies.

Tr. 215.  A physical examination of Frame by Dr. Berger was normal.

Id.  Dr. Berger's mental status examination findings were as

follows:

> Patient's attitude is cooperative. Mood is normal.
> Patient's affect is appropriate. Speech is clear,
> fluent and spontaneous. No aphasia noted while speaking.[16]
> No apparent agnosia present.[17] Language processing is
> intact.  Thought processes demonstrate coherence and
> logic.  Associative thinking is intact. Patient does not
> have delusions or hallucinations. Suicidality: none.
> Homicidality: none. Dangerousness: none. Alert and
> oriented x 3. Immediate, recent and remote memory intact.
> Attention span and concentration are normal. Judgement is
> realistic and intact. Insight is appropriate and intact.
> Knowledge and vocabulary are
> consistent with education.

Id.  Dr. Berger did not diagnose Frame as suffering from any type of

mental disorder and gave him a Global Assessment of Functioning

score fo 80.[18]

---

16.  Aphasia is defined as "any of a large group of language
disorders involving defects or loss of the power of expression by
speech, writing, or signs, or of comprehending spoken or written
language, due to injury or disease of the brain or to psychogenic
causes[.]" Dorland's Illustrated Medical Dictionary, 115 (32nd
Ed. 2012).

17.  Agnosia is defined as "loss of power to recognize the import
of sensory stimuli; the varieties correspond with the several
senses and are distiguished as auditory, visual, olfactory,
gustatory, and tactile." Dorland's Illustrated Medical
Dictionary, 40 (32nd Ed. 2012).

18.  The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness. *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
(continued...)

On April 3, 2007, Frame was examined by Michael A. Church, Ph.D., a psychologist, at the request of Dr. Berger. Tr. 185-187. Frame told Dr. Church that he wanted to join the military to obtain training and placement. Tr. 186.  Frame told Dr. Church that he had three convictions for driving under the influence of alcohol, the last one in 2005. Tr. 186.  After administering psychological testing, the Minnesota Multiphasic Personality Inventory-2, Dr. Church concluded that Frame was functioning within the "normal" range and that Frame's most significant problem was his abuse of or dependence on alcohol. Tr. 187.

Frame alleges that he became disabled on August 1, 2007. However, the record does not reveal Frame's reason for selecting

18.  (...continued)
if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id.  A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.  A GAF score of 71 to 80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning. Id.

August 1, 2007, as the alleged onset date.  Furthermore, there is no evidence that Frame had mental health treatment on or about that date.

On October 30, 2007, about three months after Frame's alleged disability onset date, Frame had an appointment with Michalene Torbick, D.O., for a yearly physical. Tr. 189. The only complaint at that appointment was "some weakness in his right arm near the elbow area." Id.  Frame at the time was taking no medications. Id.  The results of a physical examination were normal, including normal upper extremity muscle strength and no muscle wasting noted. Id.  It was subsequently determined that Frame suffered from right lateral epicondylitis (tennis elbow), a condition caused by overuse.[19] Tr. 188.

According to Nancy Fitzpatrick, B.S.W., an outpatient therapist at Behavioral Health Services of Wyoming Valley (Choices) as evidence by a letter from her dated January 9, 2008, Frame on November 7, 2007, underwent a drug and alcohol evaluation and "[i]t was determined that he [met] the DSM IV criteria for alcohol dependence. . . He was participating in outpatient services once a week, until he had a relapse" and "then placed in the Intensive

_____

19.  See Tennis Elbow, Definition, Mayo Clinic staff, http://www. mayoclinic.com/health/tennis-elbow/DS00469 (Last accessed June 27, 2013).

Outpatient Program, which meets three times a week for two hours."
Tr. 196.

The next appointment Frame had with Dr. Berger was not until February 5, 2008.  Tr. 217-218.  Dr. Berger in his report of the appointment stated as follows:

> Patient's attitude is cooperative. Displays depression during encounter.  Patient's affect is appropriate.  Speech is clear, fluent and spontaneous.  No aphasia noted while speaking.  No apparent agnosia present.  Language processing intact.  Thought processes demonstrate coherence and logic.  Associative thinking is intact.  Patient does not have delusions or hallucinations.  Suicidality: none.  Homicidality: none.  Dangerousness: none.  Alert and oriented x3.  Immediate, recent and remote memory intact.  Attention span and concentration are normal.  Judgment is realistic and intact.  Insight is appropriate and intact.  Knowledge and vocabulary are consistent with education.

Tr. 218. Dr. Berger diagnosed Frame as suffering from major depressive disorder, single episode, unspecified, and gave Frame a GAF score of 64 which represents some mild symptoms or some difficulty in social, occupational or school functioning but generally functioning pretty well.[20]

On February 12, 2008, John N. Grutkowski, Ph.D., a licensed psychologist, reviewed Frames medical records on behalf of the Bureau of Disability Determination, and determined that Frame

---

20.  The only difference between Dr. Berger's mental status findings from his initial evaluation on March 3, 2007, and his finding on February 5, 2008, was that Frame "display[ed] depression during the encounter" on February 5, 2008.

suffered from major depressive disorder, single episode, unspecified, and that he was markedly limited in his ability to carry out detailed instructions and interact appropriately with the general public, and had moderate limitations in several areas of mental functioning, but that his mental condition did not meet or equal the requirements of a listed impairment and that Frame was "able to meet the basic mental demands of competitive work on a sustained basis despite his limitations resulting from his impairment." Tr. 197-213.

On February 14, 2008, as stated earlier in this memorandum, Dr. Berger completed a functional assessment which precluded Frame from engaging in any gainful employment. Tr. 219-225. Dr. Berger in the assessment indicated that Frame was markedly limited in five areas of mental functioning, including carrying out short, simple instructions, and extremely limited in five areas of mental functioning, including interacting appropriately with supervisors. Id. This work preclusive assessment was given by Dr. Berger even though at the appointment with Frame on February 5, 2008, he gave Frame a GAF score of 64 representing some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships, and Dr. Berger had not examined Frame since February 5th.

On March 24, April 24, May 7 and May 29, 2008, Frame had appointments with Jamie L. Durchin, a certified physician's assistant, employed by Dr. Berger.  Tr. 272-281.  The mental status examination findings reported at each of these appointments by the physician's assistant were exactly the same as those reported on February 5, 2008.  Id.  Also, the diagnosis was the same: major depressive disorder, single episode, unspecified.  Id. However, instead of giving Frame a GAF score of 64 the physician's assistant at these appointments gave Frame a GAF score of 55 representing moderate symptoms.  Id.  On each occasion a report was prepared by the physician's assistant which was then signed by Dr. Berger.  Id.  There is no indication that Dr. Berger conducted a clinical interview of Frame at these appointments or was present during the examinations by the physician's assistant.  Id.

On or about June 16, 2008, Frame attempted to hang himself with a belt at his mother's home.  Frame attached a belt to the top of a door by shutting the door on the belt,  placed the belt around his neck and then proceeded to attempt to hang himself.  His mother heard a commotion and opened the door which resulted in the belt being released and Frame falling to the floor.  There is no indication in the record that Frame sought medical attention for any injuries sustained to his neck or other parts of his body.  The next day he had an appointment with Dr.

Berger and Dr. Berger recommended that he voluntarily seek psychiatric treatment at First Hospital Wyoming Valley. Frame was admitted to the hospital on June 17th and discharged on June 20th. Tr. 226. During his stay at the hospital, he underwent a physical examination on June 18th by William Hottenstein, M.D., the results of which were completely normal. Tr. 228-229. Dr. Hottenstein found no physical medical problems. Id. Dr. Berger on the day of Frame's admission to the hospital assessed Frame with a GAF score of 25. Tr. 270. At the time of discharge Dr. Berger's diagnosis was major depressive disorder, recurrent, and gave Frame a GAF score of 60 representing moderate symptoms. Tr. 226 and 241.

On June 26, 2008, Frame had an appointment with physician's assistant Durchin. Tr. 266-267. The mental status findings by Mr. Durchin were as follows:

> Patient's attitude is cooperative. Improvement in mood since last visit. Patient's affect is appropriate. Speech is clear, fluent and spontaneous. No aphasia noted while speaking. No apparent agnosia present. Language processing is intact. Thought processes demonstrate coherence and logic. Associative thinking is intact. Patient does not have delusions or hallucinations. Suicidality: none. Homicidality: none. Dangerousness: none. Alert and oriented x3. Immediate, recent and remote memory intact. Attention span and concentration are normal. Judgement is realistic and intact. Insight is appropriate and intact. Knowledge and vocabulary are consistent with education.

Tr. 267. The assessment was that Frame suffered from major depressive disorder, recurrent, unspecified and he was given a GAF

22

score of 55 representing moderate symptoms. Id.  A report was prepared by the physician's assistant which was then signed by Dr. Berger.  Id.  However, there is no indication that Dr. Berger conducted a clinical interview of Frame or was present during the examination by the physician's assistant. Id.

On July 17, 2008, Frame had an appointment with Dr. Berger. Tr. 264-265.  After conducting a clinical interview, Dr. Berger's assessment was that Frame suffered from major depressive disorder, recurrent, unspecified, and gave Frame a GAF score of 60. Tr. 265.  The mental status findings by Dr. Berger were exactly the same as those reported on February 5, 2008, when Dr. Berger gave Frame a GAF score of 64. Tr. 264.  The only abnormal finding during this encounter and the February 5th encounter was that Frame displayed depression.

Over the next 32 months Frame had at least 24 appointments with either a physician's assistant, a certified registered nurse or Dr. Berger.  It is not clear how much time Frame spent with Dr. Berger at each of these appointments. Although Dr. Berger signed the reports of each appointment, it appears Frame was primarily examined by a physician assistant or registered nurse.  With respect to the mental status examinations during this 32 month period, the findings at each appointment were essentially the same as those found on July 17, 2008, when the

23

only abnormal finding was that Frame displayed a depressed mood and was given a GAF score of 60. With respect to the 24 appointments mentioned above, the GAF score assessed by Dr. Burger was 60 on August 27, September 29 and November 3, 2008; 55 on February 23, March 23, April 27, and May 27, 2009; 49 on July 15, August 12, October 12, November 16, and December 30, 2009, and January 6, March 29, April 28, June 7, June 28, July 28, September 22, October 20, November 22, and December 22, 2010; and 50 on February 15 and April 14, 2011. Tr. 254-263, 307-310, 530-559 and 591-606.

On March 24, 2009, Dr. Berger completed a second functional assessment which precluded Frame from engaging in any gainful employment. Tr. 283-287. Dr. Berger in the assessment indicated that Frame was markedly(seriously) limited in 14 areas of mental functioning, including carrying out short, simple instructions, getting along with co-workers, and making simple work-related decisions. Id. This work preclusive assessment was given by Dr. Berger even though at the appointment with Frame on March 23, 2009, he gave Frame a GAF score of 55, representing moderate symptoms,

As noted the results of mental status examinations throughout this period of time were essentially the same. Notably from October 12, 2009, to November 22, 2010, when Dr. Berger gave

24

Frame a GAF score of 49, and the diagnosis of major depressive disorder, recurrent, unspecified, the findings of the mental status examination were exactly the same as those noted on July 17, 2008, when Dr. Berger gave Frame a GAF score of 60, the upper end of the scale representing moderate symptoms.  Also, on December 22, 2010, it was reported that instead of displaying depression during the encounter, Frame had an improvement in mood and affect but Dr. Berger still gave Frame a GAF score of 49.

Frame from July 9, 2008, through March 15, 2010, had 22 counseling sessions with Scott Smith, a licensed social worker at Jewish Family Services, Wilkes-Barre, Pennsylvania. Tr. 292-304 and 643-651. On April 1, 2009, Mr. Smith completed a document entitled "Medical Opinion RE: Ability to Do Work-Related Activities (Mental)." Tr. 289-290.  In the document Mr. Smith reported that Frame was seriously limited in 18 areas of mental functioning but made the following equivocal statement: "Client's depressive symptoms, accompanied by anxiety and racing thoughts, may preclude ability to perform unskilled work." Tr. 289.

Mr. Smith's notes of the counseling sessions are only partially legible and do not appear to reveal any work preclusive mental limitations. Id.  In fact at an appointment on July 9, 2008, Frame only reported occasional depression and racing thoughts and "more energy" after taking the drug Wellbutrin. Tr.

25

304.  At an appointment on July 23, 2008, Frame reported that he was hanging out with friends at his apartment, that he took his children to Knoebels Amusement Park "a few times," that he was walking for exercise with his son and daughter, and that he qualified and received a 13-week extension of unemployment compensation benefits. Tr. 303.  On August 6, 2008, Frame reported that he stays busy with daily walks which often occur several times a day; and that he has a "myspace website" and has computer skills. Tr. 302. At this appointment, Frame also denied suicidal ideations. Id.  On September 3, 2008, Frame reported that he was on the computer and riding his bike a lot. Tr. 300. On October 8, 2008, Frame reported that he was watching his son during the day and his grandmother was staying with him and that he "gets her breakfast/meds, lunch, [and] dinner." Tr. 298.  At an appointment with Mr. Smith on November 5, 2008, Frame reported that he was doing well and that he was "caring for his grandmother" and had "partial custody of the kids." Tr. 297.  On January 6 and February 1, 2009, Frame again reported that he was caring for his grandmother. Tr. 294-295.  At the February 1st appointment, Frame also reported that he "[now] may be eligible for 8-13 ½ more w[ee]ks [of unemployment] which he has applied for." Tr. 294. On August 20, September 22 and October 26, 2009, and January 5 and

March 15, 2010, Frame reported that he was still caring for his grandmother and his children. Tr. 643, 645 and 648-649.

On April 29, 2010, Paul Taren, Ph.D., a licensed psychologist, reviewed Frames medical records on behalf of the Bureau of Disability Determination, and determined that Frame suffered from major depressive disorder and alcohol abuse and that he was moderately limited[21] in his ability to maintain attention and concentration, complete a normal workday and workweek and accept instructions and respond appropriately to criticism from supervisors, but that his mental condition did not meet or equal the requirements of a listed impairment and that Frame was "able to carry out simple, routine tasks despite the limitations resulting from his impairments." Tr. 568-584.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Frame had not engaged in substantial gainful activity since August 1, 2007, the alleged disability onset date. Tr. 317.

At step two, the administrative law judge found that Frame suffers from the following severe impairments: major depressive disorder[.] Id.

---

21. Moderately limited is defined as the ability to function is limited but the individual is still able to function satisfactorily. Tr. 219.

At step three of the sequential evaluation process the administrative law judge found that Frame's impairments did not individually or in combination meet or equal a listed impairment. Tr. 317-318.

In addressing step four of the sequential evaluation process in his decision, the administrative law judge found that Frame could not perform his past semi-skilled, heavy work as a plumber's helper but that he could perform a limited range of unskilled work at all physical exertional levels. Tr. 318-325. Specifically, the administrative law judge found that Frame could perform work under the following conditions:

> The claimant needs to be in a work setting generally removed from contact with members of the public. The work should be of an independent nature and it should be routine, repetitive task at a simple unskilled level. The work environment should be free from significant changes in the work setting and it needs to be a predictable work environment. The work should not require the exercise of independent judgment or any kind of decision-making and it should not involve processing of any type of complex instructions. Communication in the work setting should be oral and of a simple nature, not written and not complex. The work should not be of a high volume, high production pace.

Tr. 318. In arriving at this residual functional capacity the administrative law judge found that Frame's statements about his functional limitations were not credible. Tr. 321. The administrative law judge also rejected the opinions of Dr. Berger and Mr. Smith. In so doing the ALJ pointed out the inconsistency

28

between Dr. Berger's mental status examination findings, the GAF scores and the marked and extreme limitations imposed by Dr. Berger. Tr. 323-325. The ALJ in setting the above residual functional capacity also relied on the opinions of the state agency psychologists, Dr. Grutkowski and Dr. Taren. Tr. 326.

At step five, the administrative law judge based on the above residual functional capacity and the testimony of a vocational expert found that Frame had the ability to perform unskilled, simple work such as a dishwasher, an auto detailer, and a housekeeper, and that there were a significant number of such jobs in the economy of Northeastern Pennsylvania. Tr. 327.

The administrative record in this case is 830 pages in length and we have thoroughly reviewed that record. The administrative law judge did an excellent job of reviewing Frame's medical history and vocational background in his decision. Tr. 314-327. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant. Frame argues that the ALJ erred by (1) failing to appropriately consider the opinions of Dr. Berger and Mr. Smith, (2) failing to include all of Frame's limitations in the hypothetical question to the vocational expert, and (3) failing to make a proper credibility determination of

Frame's mother and misconstruing her testimony.  We find no merit in these arguments.

First, the administrative law judge explained in detail why he rejected the opinions of Dr. Berger and Mr. Smith. Tr. 320-326.  We will not repeat that explanation other than noting that the administrative law judge pointed out the inconsistency between Dr. Berger's mental status examination findings and the GAF scores below 51 as well as the marked and extreme limitations which he assessed.[22]

The administrative law judge relied on the opinions of Dr. Grutkowski and Dr. Taren, the state agency psychologists who reviewed Frame's medical records. The administrative law judge relied on those opinions in rejecting the opinions of Dr. Berger and Mr. Smith and setting Frame's residual functional capacity. The administrative law judge's reliance on those opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d.

---

22.  The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p.  Likewise, an administrative law judge is not obliged to accept the testimony of a claimant if it is not supported by the medical evidence.  An impairment, whether physical or mental, must be established by "medical evidence consisting of signs, symptoms, and laboratory findings," and not just by the claimant's subjective statements.  20 C.F.R. § 404.1508 (2007).

356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Second, Frame's argument that the administrative law judge erred when he failed to present an appropriate hypothetical question to the vocational expert needs only a brief comment. An administrative law judge is only required to ask a hypothetical question which contains a claimant's credibly established limitations. Rutherford v. Barnhart, 399 F.3d 546, 555 (3d Cir. 2005). The hypothetical question presented to the vocational expert encompassed all the limitations/restrictions contained within the ultimate residual functional capacity set by the ALJ. That residual functional capacity is supported by substantial evidence. Furthermore, counsel who represented Frame at the administrative hearing and represents Frame in the present appeal had an opportunity to ask further questions of the vocational expert. We are satisfied that the administrative law judge considered all of Frame's credibly established limitations when framing a hypothetical questions for the vocational expert and in setting the residual functional capacity.

Finally, with regard Frame's argument that the administrative law judge inappropriately judged the credibility of

his mother who testified at the first hearing and also misconstrued her testimony, the administrative law judge was not required to accept the testimony of the mother See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed Frame's mother testify at the hearing on May 28, 2009, the administrative law judge is the one best suited to assess the credibility of the mother. Furthermore, we are unable to discern how the administrative law judge misconstrued the mother's testimony. To the extent that Frame is arguing that the ALJ rejected the mother's testimony that the stepfather was at home while she was at work and could assist Frame with the child care,

the record reveals that the stepfather was wheelchair bound and Frame testified that he did not receive assistance from the stepfather. The record is also replete with references to Frame caring for his children and his grandmother. The ALJ appropriately considered the testimony of Frame's mother.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


 /s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: July 8, 2013

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRADLEY C. FRAME,             :
          Plaintiff          :    No. 1:11-CV-02275
                             :
     v.                      :    (Judge Caldwell)
                             :
CAROLYN W. COLVIN, ACTING     :
COMMISSIONER OF SOCIAL        :
SECURITY,                     :
          Defendant          :


ORDER

          In accordance with the accompanying memorandum, **IT IS
HEREBY ORDERED THAT:**

          1.  The Clerk of Court shall enter judgment in favor of
the Commissioner and against Bradely C. Frame as set forth in the
following paragraph.

          2.  The decision of the Commissioner of Social Security
denying Bradley C. Frame disability insurance benefits is
affirmed.

          3.  The Clerk of Court shall close this case.


           /s/ William W. Caldwell
          WILLIAM W. CALDWELL
          United States District Judge

Dated: July 8, 2013